**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JOHN W. HUMPHREY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 4:14-40127-TSH** |
| | ) | |
| TOWN OF SPENCER, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

**March 6, 2017**

Hennessy, M.J.

By Order of Reference dated May 15, 2015 (Docket #12), and pursuant to 28 U.S.C. § 636(b)(1)(A), this matter, including all other pretrial and dispositive motions, was referred to me for a ruling on Defendants'[1] collective Motion for Partial Summary Judgment (Docket #60). Plaintiff John W. Humphrey filed an opposition to the motion. (Docket #68). This matter is now ripe for adjudication. In consideration of the foregoing submissions and for the reasons that follow, I recommend that Defendants' Motion to Partial Summary Judgment (Docket #60) be GRANTED as to Counts V, VII, and VIII and DENIED as to Count VI.

---

[1] Defendants in this matter are the Town of Spencer, Spencer Police Officer Todd LaPorte, Spencer Police Officer Paul Magierowski, and Chief of Spencer Police David Darrin. Sergeant George L. Edwards has been dismissed as a party to the action as a result of a stipulation. (Docket #63).

1

I.      BACKGROUND[2]

**The Incident**

On September 22, 2011, Plaintiff Humphrey was living at Kim Thomas's apartment on Elm Street in Spencer with his girlfriend, Katy Lajeunesse.  (Docket #67-1 ¶ 1).  That evening, Ms. Lajeunesse was on the phone with her mother when Plaintiff and Lajeunesse got into an argument.  (Id. ¶ 2).  At around 11:16 p.m. the call disconnected during the argument, prompting Lajeunesse's mother to call 9-1-1 and report a domestic disturbance.  (Docket #67 ¶¶ 8-9).  After receiving the report, Spencer Police discovered that Plaintiff had an outstanding arrest warrant and a criminal history which included convictions for assault and battery, criminal threats, intimidation, and multiple abuse prevention orders.  (Docket #67 ¶¶ 11-12).  Moreover, Plaintiff was already known to several members of the Spencer Police Department ("SPD") as a result of previous encounters with him, including one incident where he threatened to harm officers or himself with a knife.  (Docket #67 ¶ 13).

Defendant Officer Todd LaPorte and Defendant Officer Paul Magierowski were apprised of Plaintiff's criminal history at the Spencer Police Department.  (Docket #67 ¶ 14).  Officer LaPorte then contacted the East Brookfield Police Department and the Massachusetts State Police ("MSP") for backup.  (Docket #67 ¶ 19).  As a result, East Brookfield Officer Joseph Lazarick

---

[2]   The Defendants' Statement of Undisputed Material Facts (Docket #61) contains several erroneous citations to the record, and Plaintiff, in many instances, denies those statements on the basis that they are not properly supported by a correct record citation, (see Docket #67).  Although, in some instances, the record elsewhere lends credence to Defendants' assertions, the failure to properly support propositions is a violation of Local Rule 56.1, stating that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation."  As a result, the following facts are drawn primarily from Plaintiff's Statement of Additional Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment.  (See Docket #67-1).

reported directly to the Spencer Police Station where the officers, along with Sergeant George L. Edwards, conferred prior to reporting to the scene.  (See Docket #67 ¶¶ 21, 23-29).  Massachusetts State Troopers Marland Rogers and Matthew Mormino later responded directly to the scene, having been briefed by LaPorte about the nature of the call and Plaintiff's criminal history.  (Docket #67 ¶¶ 36-37).

Upon arrival at the scene, LaPorte and Magierowski knocked on the door of the apartment and Kim Thomas answered, identifying herself as a tenant of the apartment.  (Docket #67 ¶¶ 30-31).  When asked for the whereabouts of Plaintiff and his girlfriend, Thomas initially denied that either was present, but then admitted that they were both in the apartment.  (Docket #67 ¶¶ 33-35).  LaPorte and Magierowski proceeded into the apartment until they reached a locked door separating the kitchen from the living room.  (Docket #67 ¶ 41).

LaPorte knocked on the door and received no response.  (Docket #67 ¶ 43).  According to Plaintiff, when he heard the police knock at the door he ran to the bedroom off the living room and hid behind the bedroom door because he knew there was a warrant for his arrest.  (Docket #67 ¶ 44).  LaPorte again knocked and Lajeunesse opened the door.  (Docket #67 ¶ 46).  Lajeunesse denied any domestic abuse earlier in the evening and said that Plaintiff had left the apartment hours before.  (Docket #67 ¶¶ 47-49).

LaPorte and Magierowski asked Lajeunesse to step out of the doorway and she complied.  (Docket #67 ¶ 50).  Both officers stepped into the living room.  (Docket #67 ¶ 52).  The room was dimly lit.  (Docket #67-1 ¶ 66).  LaPorte had his flashlight on and gun drawn in the low-ready position as he and Magierowski began to search for Plaintiff.  (Docket #67-1 ¶ 62).[3]  As this

---

[3]  Officer LaPorte also had a Taser on his equipment belt but did not deploy it.  (Docket #67-1 ¶ 37).

occurred, the two Troopers entered the apartment, but remained near the apartment entrance separate from LaPorte and Magierowski.  (Docket #67-1 ¶ 64).  Eventually, only the bedroom remained to be searched.  (Docket #67-1 ¶ 65).  The door to the bedroom which opened inwardly from the living room was partially open.  (Docket #67-1 ¶¶ 5-6).   The bedroom was dark. (Docket #67-1 ¶ 66).

The parties dispute what occurred next.  According to the Plaintiff, he was hiding behind the door with his hands raised above the door.  (Docket #67-1 ¶ 4).  Officer LaPorte crossed the threshold into the bedroom, kicked the partially open door with his foot and leaned into the door, thereby "smushing" Plaintiff against the wall.  (Docket #67-1 ¶¶ 7-8).  Plaintiff's hands stayed up and he "surrendered multiple times," but Officer LaPorte nonetheless shot him in his abdomen. (Docket #67-1 ¶ 7).  After he was shot, LaPorte told Plaintiff "I didn't [shoot you].  I only tased you," (Docket #67-1 ¶ 10), and Plaintiff heard another officer ask LaPorte, "[W]hy [did] you shoot him[?]  You [were] only supposed to tase him[.]"  (Docket #67-1 ¶ 10).

In contrast, according to Defendants, Magierowski remained at the bedroom entry with his Taser drawn.  (Docket #67-1 ¶ 39).  LaPorte entered the bedroom with his flashlight on and gun drawn, and proceeded to search the room in a counterclockwise direction.  (Docket #61 ¶ 54; Docket #67-1 ¶ 72).  When the only space left to be cleared was behind the partially open door, LaPorte, while facing the door, pulled the door and felt resistance, as if someone was holding it open from the opposite side.  (Docket #67-1 ¶¶ 72-77).  LaPorte then pulled the door harder; it quickly shut, revealing in the light from LaPorte's flashlight the Plaintiff standing only a few feet away.  (Docket #67-1 ¶¶ 76-78).  Plaintiff took a step toward LaPorte and, without being able to

see Plaintiff's hands, LaPorte shot Plaintiff once in his abdomen.[4]   (Docket #67-1 ¶¶ 78-79, 85).

LaPorte and Magierowski immediately began treating Plaintiff who was conscious and could hear them speaking.   (Docket #67 ¶ 57).   The Spencer Rescue Squad arrived shortly thereafter to assume medical care and bring Plaintiff to the hospital.   (Docket #67 ¶ 58).

The officers at the scene with LaPorte did not discuss the shooting.   For instance, in response to LaPorte trying to explain what happened, Lazarick said, "I don't want you to, you know, get into any specifics.   It's best that you, you know, talk to your union rep."   (Docket #67-1 ¶ 17).   Additionally, Lazarick again stopped LaPorte from discussing the shooting later at the station, deposing that LaPorte "began to explain but I told him not to."   (Docket #67-1 ¶ 18).   Similarly, Magierowski did not ask LaPorte about the incident because someone told him "basically not to talk about the incident."   (Docket #67-1 ¶ 24).   Lastly, neither Trooper Mormino nor Trooper Rogers asked LaPorte about the incident, and each deposed that if he had tried to talk to them they probably would have discouraged that discussion.   (Docket #67-1 ¶¶ 25, 29).   LaPorte spoke to Sergeant Edwards and Chief David Darrin after the incident, but no account of that conversation was recorded.   (Docket #67-1 ¶¶ 115, 117, 119).

After the shooting, Chief Darrin asked MSP to conduct an investigation to determine whether criminal charges should be brought against LaPorte.   (Docket #67-1 ¶ 110).   As a result of its investigation, MSP obtained written statements from the witnesses, including Plaintiff Humphrey, Katy Lajeunesse, Kim Thomas, Officer LaPorte, Officer Magierowski, and Officer Lazarick.   (See Docket #61-10 at 6).   Ultimately LaPorte was not charged. (Docket #67-1 ¶ 123).   Independent of the investigation, Chief Darrin did not interview witnesses,

---

[4]   Plaintiff also contends that Defendants' version of events is "forensically implausible." (Docket #67-1 ¶¶ 60-89).

(Docket #67-1 ¶¶ 124-25), instead deferring to the MSP investigation and report.  (Docket #61-11 at 46).

With regard to Officer LaPorte's training and experience, LaPorte received his training at the Boylston Regional police Academy, run by the Massachusetts Criminal Justice Training Council.  (Docket #61 ¶ 65).  In the academy, LaPorte received training on subjects including criminal and constitutional law, first aid, CPR, firearms, use of force, and defensive tactics.  (Docket #61 ¶ 66).  Neither LaPorte nor Magierowski have any disciplinary history, and no complaint has ever been filed against either officer.  (Docket #61-11 at 24-25).

The use of force training curriculum provides, in pertinent part, that an officer "may use deadly force in self-defense or defense of others if the four following conditions exist: a) The subject has the ability (e.g., a firearm or a knife) to cause death or serious bodily harm. b) The subject has the opportunity to use his or her ability (e.g., a firearm or a knife) to cause death or serious bodily injury. c) The subject's threat of causing death or serious bodily injury is imminent (a life is in jeopardy). d) The officer has no reasonable alternative for addressing the subject."  (Docket #67-1 ¶ 56 (internal citations omitted)).  SPD has a use of force policy that requires that officers use force "[t]hat is reasonably necessary to accomplish lawful objectives," and that deadly force is authorized under a limited set of circumstances.  (Docket #67-1 ¶ 58; see Docket #67-6).  In addition, pursuant to that policy, the Chief of Spencer Police is required to "conduct an administrative review of all reports submitted to determine whether the use of force was in compliance with departmental policy and procedure."  (Docket #67-1 ¶ 59).

## Municipal Liability and Supervisory Claims

SPD has approximately seventeen sworn officers and does not have an internal affairs unit.  (Docket #61-11 at 8; Docket #67-1 ¶ 99).  Darrin has been the Chief for over 18 years.

(Docket #67-1 ¶ 90).  Darrin became the Chief shortly after MSP's management of SPD in 1998 in response to allegations of misuse of funds and "certain types of force."  (Docket #67-1 ¶¶ 91, 95).  When a citizen complaint is received, it is directed either to the officer in charge or directly to the Chief of Police.  (Docket #67-1 ¶ 97).  The Chief has the authority to give verbal and written reprimands or issue suspensions for less than five days.  (Docket #67-1 ¶ 102).  Any punitive action beyond that must be approved by the Town.  (Docket #67-1 ¶ 101).

In the past ten years, Chief Darrin has issued only one suspension for one day for conduct unbecoming of a police officer.  (Docket #67-1 ¶ 103).  Darrin reviews every police report generated by officers for, among other things, compliance with policies and procedures.  (Docket #61-11 ¶ 19).  Darrin has also never sustained a complaint of excessive force against an SPD officer.  (Docket #67-1 ¶ 104).  Although he tracks the use of force where a weapon is involved, Darrin does not track the hands-only use of force.

## II.   PROCEDURAL BACKGROUND

 Plaintiff initiated this action by filing a complaint on September 5, 2014.  (Docket #1).  In his complaint, Plaintiff asserts the following nine claims:

| | |
|---|---|
| Count I | Section 1983 – Excessive force |
| | *Against Officer LaPorte* |
| Count II | Common Law Assault and Battery; |
| | *Against Officer LaPorte* |
| Count III | Negligent Infliction of Emotional Distress |
| | *Against Officer LaPorte* |
| Count IV | Intentional Infliction of Emotional Distress |
| | *Against Officer LaPorte* |
| Count V | Massachusetts Civil Rights Act; G.L. c. 12, § 11I |
| | *Against Officer LaPorte, Sgt. Edwards and Chief Darrin* |
| Count VI | Massachusetts Tort Claims Act 258 |
| | *Against Town of Spencer* |
| Count VII | Section 1983 – Conspiracy |
| | *Against Officers LaPorte and Magierowski* |
| Count VIII | Section 1983 Monell claim |
| | *Against Town of Spencer, Chief Darrin and Sgt. Edwards* |

Count IX   Malicious Prosecution
*Against Officer LaPorte, Sgt. Edwards and Chief Darrin*

(See Docket #1).  On August 18, 2016, Defendants collectively filed a Motion for Partial Summary Judgment as to Counts V, VI, VII, and VIII.  (Docket #60, 62).  As a result of a stipulation, Sergeant George Edwards was dismissed as a party, and the following Counts were dismissed: Count I, but only as to unlawful arrest, Count III, and Count IX.  (Docket #63).  On September 15, 2016, Plaintiff filed an opposition to Defendants' motion.  (Docket #68).

## II.   STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Moreover, the Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

## III.   ANALYSIS

### Count V – Massachusetts Civil Right Act

I recommend granting the Defendants' Motion for Summary Judgment (Docket #60) as to Count V of the complaint, alleging a violation of the Massachusetts Civil Rights Act by Officer LaPorte and Chief Darrin.

The Massachusetts Civil Rights Act ("MCRA") prohibits persons from "interfer[ing] by threats, intimidation or coercion, or attempt[ing] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." Mass. Gen. Laws ch. 12, § 11H; see Mass. Gen. Laws ch. 12, § 11I (providing a civil cause of action for aggrieved persons based on section 11H). "To establish a claim under the [MCRA], the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Muldoon v. Dep't of Corr., No.: 15-cv-13892-DJC, 2017 U.S. Dist. LEXIS 17105, at *7-8 (February 7, 2017) (quoting Do Corp. v. Town of Stoughton, No. 13-cv-11726-DJC, 2013 U.S. Dist. LEXIS 172199, at *12 (D. Mass. Dec. 6, 2013)) (alteration in original).

Pursuant to the MCRA, a threat is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Muldoon v. Dep't of Corr., No.: 15-cv-13892-DJC, 2017 U.S. Dist. LEXIS 17105, at *9 (D. Mass. February 7, 2017) (quoting Ayasli v. Armstrong, 56 Mass. App. Ct. 740, 750 (2002)). Intimidation means putting someone "in fear for the purpose of compelling or deterring conduct." Id. (quoting Ayasli, 56 Mass. App. Ct. at 750). Finally, coercion is "the application to another of such force, either physical or moral, as to" make someone do something against his or her will. Ayasli, 56 Mass. App. Ct. at 750.

The threats, intimidation, or coercion requisite was specifically intended to reduce the scope of liability under the MCRA. Id. In that light, courts have made clear that the threats, intimidation, or coercion must be separate and distinct from the alleged constitutional violation.

9

See Muldoon, 2017 U.S. Dist. LEXIS 17105, at *9; see also Barbosa v. Conlon, 962 F. Supp. 2d 316, 331-32 (D. Mass. 2013) (concluding that although plaintiff set forth sufficient facts to show a constitutional violation, MCRA claim nonetheless failed because there was no evidence of coercion); Titus v. Town of Nantucket, 840 F. Supp. 2d 404, 416 (D. Mass. 2011) (same); Britton v. Maloney, 901 F. Supp. 444, 453 (D. Mass., 1995) ("A direct violation of civil rights is not, without a showing of coercive behavior, actionable."); Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 989 (1994) (stating that a "direct violation of a person's rights does not by itself involve threats, intimidation, or coercion").

Here, Plaintiff contends that Officer LaPorte used excessive and unjustified force by shooting Plaintiff in the abdomen after Plaintiff had surrendered.  In his opposition to the Motion for Summary Judgment, Plaintiff contends that the "threats, intimidation or coercion" requirement of the MCRA is satisfied because "the defendants[5] assaulted the plaintiff in order to cause the plaintiff to give up his right to be free from excessive force, or threatened arrest in order to cause him to give up his right to be free from false arrest."  (Docket #68 at 19).  Aside from these allegations, Plaintiff identifies nothing in the record that could tend to suggest threats, intimidation or coercion.  (See Docket #68 at 18-19).

Plaintiff's argument is unpersuasive because it impermissibly conflates the requisite threats, intimidation or coercion with the alleged constitutional violation.  Indeed, courts have addressed and rejected similar arguments in this context.  See Patino v. City of Revere, No. 13-11114-FDS, 2014 U.S. Dist. LEXIS 5639, at *30 (D. Mass. January 16, 2014)

---

[5]  In his complaint, Plaintiff names both Officer LaPorte and Chief Darrin in Count V.  This claim necessarily fails as to Darrin because no threats, intimidation, or coercion were or could be attributed to Darrin, given that he was not present during the incident.  Thus, with regard to Count V, the motion could be granted as to Darrin on that basis alone.

("Allegations of excessive force and unlawful arrest, without more, have consistently been held not to constitute violations of the MCRA."); Farrah v. Gondella, 725 F. Supp. 2d 238, 248 (D. Mass. 2010) ("Here, [the administrator of the alleged victim's estate] has pled a violation of [the alleged victim's] Fourth Amendment right to be free from excessive force.  What is absent, however, is any showing (or even pleading) that the violation was intended to coerce [the alleged victim] into refraining from the exercise of a right or privilege secured by law."); Orwat v. Maloney, 360 F. Supp. 2d 146, 164-65 (D. Mass. 2005) (concluding that while inmate established a violation of the Eighth Amendment right to be free from excessive force, such violation directly impinged upon that right and thus did not amount to a threat, coercion, or intimidation for purposes of the MCRA).  Because Plaintiff has failed to make any showing that the alleged constitutional violation was a product of threats, intimidation or coercion, I recommend that the Court grant the Motion for Summary Judgment as to Count V.

**Count VI – Massachusetts Tort Claims Act**

Turning next to Count VI, alleging a violation of the Massachusetts Tort Claims Act ("MTCA") by the Town of Spencer ("the Town"), I recommend that the Court deny the motion.

The MTCA "abrogates the doctrine of sovereign immunity and allows a suit against a public entity, but only to the extent provided in the statute." Titus, 840 F. Supp. 2d at 411 (citing Chaabouni v. City of Boston, 133 F. Supp. 2d 93, 95 (D. Mass. 2001)).  Pursuant to section 2 of the MTCA, "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances."  Mass. Gen. Laws ch. 258, § 2.  Public employers, however, nonetheless remain immune from "any claim arising out of an intentional tort, including

assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations." Mass. Gen. Laws ch. 258, § 10(c); see Titus, 840 F. Supp. 2d at 411.

Defendants contend that their motion as to Count VI should be granted because "[v]ery simply, Plaintiff's claim[] [is] not brought in negligence. His claim is premised on his allegation that Officer LaPorte intentionally shot [Plaintiff] in the abdomen." (Docket #62 at 10). Assumingly, Defendants' argument relies on—albeit without reference to—the exclusion set forth in section 10(c) of the MTCA.

As an initial matter, Defendants fail to acknowledge that Plaintiff's MTCA claim expressly sounds in negligence. In Count VI of the complaint, Plaintiff advances two distinct theories of negligence. (See Docket #1 ¶¶ 132-33). First, Plaintiff contends that "[t]he Town, its agents, servants, employees and others for whose unintentional tortious conduct it is legally responsible, were negligent and/or grossly negligent in the training, supervision and disciplining of police officers in the use of force." (Docket #1 ¶ 132). Second, Plaintiff also alleges that "Officer LaPorte, an employee of the town for whose unintentional tortious conduct it is legally responsible, breached the duty of care owed to Humphrey by shooting him as set forth herein." (Docket #1 ¶ 133). The complaint therefore makes clear that Plaintiff's theory of liability is predicated on contentions of negligence by both the Town itself and by Officer LaPorte. (See Docket #1).

Turning to the first theory of liability alleging negligence by the Town, courts have addressed the applicability of section 10(c) of the MTCA when an intentional act undergirds a negligence claim against a municipality. See Chaabouni, 133 F. Supp. 2d at 95-98. In Hathaway v. Stone, for example, the defendant City of Boston moved for summary judgment on the basis of

section 10(c), arguing that it could not be sued for an alleged assault and battery by one of its

police officers because assault and battery constitutes an intentional tort.  687 F. Supp. 708, 711

(D. Mass. 1988).  The court denied the motion for summary judgment and stated the following:

> The City misconstrues the plaintiff's complaint. . . .  Count IX alleges that the City
> was negligent in training, supervising, and continuing to employ [the police
> officer], which negligence resulted in the assault and battery.  This claim is based
> on the City's own negligence, rather than [the officer's] intentional tort.  The
> negligence claim against the City does not 'arise out of' [the officer's] intentional
> torts, but rests on an independent negligent act by the City."

Id.

As in Hathaway, Defendants here misconstrue the Plaintiff's complaint as alleging only

intentional conduct, when—at least with regard to the allegations of negligent training and

supervision—Plaintiff's theory is focused on the Town's negligence, not the officer's intentional

actions.  Indeed, other courts have similarly concluded that contentions of negligent training can

suffice to prevent the operation of the intentional act exclusion in section 10(c).  See Winfield v.

Perocchi, No. 1:14-cv-12219-IT, 2015 U.S. Dist. LEXIS 95573, at *9-10 (D. Mass July 22, 2015)

("While the [MTCA] excludes a public employer from liability for any claim arising out of an

intentional tort, a plaintiff may pursue negligent training and supervision claims against a

municipality even where such claims stem from an intentional tort committed by a public

employee.") (citation omitted); see also Doe v. Town of Blandford, 525 N.E.2d 403, 408 (1988)

(concluding that the intentional tort exception, which grants governmental immunity, should be

interpreted narrowly, "thereby allowing actions to be brought against the government when a claim

independent of the intentional tort is alleged").  Thus, section 10(c) does not operate to bar a claim

where, as here, negligent training or supervision is the basis of the claim against a municipality—

not the underlying alleged intentional tort.

On the other hand, Plaintiff's alternative theory that the Town is liable for Officer LaPorte's alleged breach of the duty of care by intentionally shooting Plaintiff is barred by section 10(c) of the MTCA because it simply cloaks an intentional action in a theory of negligence.  Plaintiff attempts to circumvent the operation of section 10(c) by arguing that "[a] reasonable jury could find that LaPorte and Magierowski failed to exercise reasonable care towards Humphrey when instead of apprehending him they shot him."  (Docket #68 at 16).  A similar argument, however, was rejected by the court in Blanchard v. Swaine, No. 08-40073-FDS, 2010 U.S. Dist. LEXIS 125397 (D. Mass. Nov. 29, 2010).  In Blanchard, the court denied a motion for summary judgment based on the MTCA, concluding that "[a] reasonable jury could find that [a police officer] failed to exercise reasonable care toward [the plaintiff] when he struck him with the police cruiser." Blanchard, 2010 U.S. Dist. LEXIS 125397 at *45 & n.20.  Despite the fact that Blanchard was suing on the basis of negligence, in a footnote the court qualified its conclusion by noting that "[i]f a reasonable jury determined that [the officer] *intentionally* hit [the plaintiff], his tort claims against the City arising from [the officer's] conduct would necessarily fail" because the MTCA provides immunity for intentional torts.  Thus, the court made clear that it would not have used the reasonable jury standard if the claimed negligence was predicated on an intentional act.  Here, there is no allegation that Officer LaPorte's shooting of Plaintiff was unintentional; rather, Plaintiff's theory of negligence is that Officer LaPorte breached the duty of care by intentionally shooting him.  (Docket #1 ¶ 133).  Because the uncontroverted record evidence shows that LaPorte intentionally shot Plaintiff, this case falls squarely within the court's reasoning in Blanchard.

Such a finding is consistent with the Chaabouni court's conclusion that the core of jurisprudence in this area is that the negligence claim should rest on "wholly different grounds than the intentional tort [] that . . . immediately precipitate[d] the dispute."  133 F. Supp. 2d at 97.

Unlike the negligence in training context where the redress is based on a theory that the municipality itself failed to provide sufficient training, Plaintiff's notion here that LaPorte breached the duty of care by intentionally shooting him is focused exclusively on the intentional act of LaPorte, not any act of the municipality.   Therefore, Plaintiff's alternative theory for municipal liability pursuant to the MTCA is barred by section 10(c).

Aside from making a cursory argument that Plaintiff's claim is based on an intentional act, Defendants do not address the merits of Plaintiff's failure to train claim.  (See Docket #62 at 10). I therefore recommend that the Court deny the Defendants' motion as to Count VI because, at least with regard to the contentions of negligent training and supervision by the Town, the Plaintiff has advanced a sufficient theory of liability outside the scope of section 10(c)'s bar on claims arising out of intentional torts.

### Count VII – Section 1983 Conspiracy

With regard to Count VII, alleging a conspiracy between LaPorte and Magierowski in violation of 42 U.S.C. § 1983, I recommend that this Court grant Defendants' motion.

"A civil rights conspiracy is commonly defined as a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages."  Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (internal quotations and citation omitted).  In order for a conspiracy to be actionable pursuant to section 1983, a plaintiff must prove that, in addition to a conspiratorial agreement, there has been "an actual deprivation of a right secured by the Constitution and laws."  Santiago v. Fenton, 891 F.2d 373, 389 (1st Cir. 1989) (quoting Earle, 850 F.2d at 844).

In his complaint, Plaintiff contends that "Officers LaPorte and Magierowski conspired to hide LaPorte's misconduct by agreeing, cooperating and coordinating with one another in the filing of false reports and/or the giving of false statements in an effort to portray LaPorte's shooting of Humphrey as reasonable."  (Docket #1 ¶ 139).  Further, Plaintiff adds that "[w]hen police officers act in concert to apply excessive force, there is a genuine issue of material fact as to whether the officers engaged in a conspiracy.  Here, a fact finder could infer from the Defendants' testimony and from plaintiff's ("you was only supposed to tase him[.]"), there was a code of silence within the SPD and that defendants' denial evinces its existence."  (Docket #68 at 18) (internal citation omitted).

Despite referencing "Defendants' testimony," id., Plaintiff fails to direct this court to any evidence or testimony from which a "code of silence" can be inferred.  To the extent that Plaintiff might be alluding to the fact that various law enforcement agents deposed that they told LaPorte they did not want to discuss the shooting with him, none of those agents—with the exception of Officer Magierowski—are Defendants or alleged coconspirators in this action.  (See Docket #1 at 1).  As to Magierowski, he deposed that he did not ask LaPorte about the incident because someone told him "basically not to talk about the incident."  (Docket #61-6 at 61).  As to the other officers, evidence that they made no affirmative effort to glean information relating to an officer-involved shooting without more, however, does not support the notion that there was a concerted effort to cover up alleged misconduct.  To the precise contrary, the largely uniform testimony that the law enforcement agents did not ask or speak about the shooting tends to undermine Plaintiff's argument that there was a joint effort to "coordinat[e] with one another in the filing of false reports and/or the giving of false statements."  (Docket #1 ¶ 139).  Moreover, notwithstanding the evidence of officers being reluctant to discuss the shooting with LaPorte, there

is no evidence that any officer withheld information or otherwise failed to cooperate with MSP's investigation of the shooting.

In any case, as to the alleged conspiracy between Officers LaPorte and Magierowski, Plaintiff has cited no evidence, and this Court can find none, from which a factfinder could reasonably conclude that (1) LaPorte and Magierowski conspired to apply excessive force; rather, it appears that LaPorte acted entirely on his own and instinctively, (Docket #61-2 at 134-35); or (2) that either officer otherwise falsely reported the incident. See Fragoso v. Lopez, 991 F.2d 878, 887 (1st Cir. 1993) ("[P]roffers that depend not on verified facts but 'on arrant speculation, optimistic surmise, or farfetched inference' cannot forestall summary judgment.") (quoting Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991)).   I therefore recommend the Court grant Defendants' motion for summary judgment as to Count VII.

**Count VIII – Municipal Liability**

Lastly, Defendants move for summary judgment as to Count VIII, in which Plaintiff seeks damages under a theory of municipal liability.  Pursuant to 42 U.S.C. § 1983, individuals have the right to sue those acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia . . . [for] the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."   In that regard, a plaintiff must show that 'the challenged conduct [is] attributable to a person acting under color of state law' and that 'the conduct must have worked a denial of rights secured by the Constitution or by federal law.'" Freeman v. Town of Hudson, 714 F.3d 29, 37 (1st Cir. 2013) (quoting Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997)) (alteration in original).

It is settled that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Rather, it must be shown that

the "the municipality *itself* cause[d] the constitutional violation at issue." City of Canton v. Harris, 489 U.S. 378, 385 (1989); see Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992) ("The city is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer."). The Supreme Court, in effort to prevent municipal liability from "collaps[ing] into de facto *respondeat superior*[,] has set a very high bar for assessing municipal liability under Monell." Young v. City of Providence, 404 F.3d 4, 26 (1st Cir. 2005).

Wrongdoing can be directly attributed to the municipality when the constitutional deprivation arises from a governmental policy or practice. Cox v. Murphy, No. 12-11817-FDS, 2016 U.S. Dist. LEXIS 99890, at *19-20 (D. Mass. Feb. 12, 2016). Thus, a plaintiff must show that: "(1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or train its officers; (2) this custom, policy, or practice was such that it demonstrated a "deliberate indifference" to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation." Id. at 20 (citing DiRico v. City of Quincy, 404 F.3d 464, 468-69 (1st Cir. 2005)); see also Young, 404 F.3d at 26.

The policy or custom need not have "received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 691. "A single decision by a municipal policymaker constitutes official policy 'only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" Freeman, 714 F.3d at 38 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). Whether a decisionmaker has final policymaking authority is a question of law determined by state and local laws, including descriptions of duties and obligations. See id.; see also Sanoguet-Valentin v. Mun. Gov't of

18

Mayaguez, No. 14-1182 (PAD), 2017 U.S. Dist. LEXIS 15730, at *3 (D.P.R. Feb. 2, 2017). Unofficial practices, policies, and customs may still be actionable under Monell if they are "'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of [those practices, policies, and customs] yet did nothing to end [them].'" Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005) (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)).

Plaintiff Humphrey asserts two grounds for his Monell claim: (1) the Town and its policymakers failed to properly train officers in the use of force; and (2) the Town failed to investigate, supervise and discipline the police officers employed by the Town, or there was otherwise a policy or custom by the Town to condone excessive force because the Town had a "longstanding policy of not investigating critical incidents" and "consistently condoned the use of force by officers." (Docket #1 at 13; Docket #68 at 9).

**Failure to Train**

First, Plaintiff contends that the Town had a custom, policy, or practice of failing to adequately train its officers. The burden is on the Plaintiff to show a causal link between the purported constitutional violation and an alleged failure by the Town to adequately train its police officers. See Douglas v. City of Springfield, No. 3:14-cv-30210-MAP, 2016 U.S. Dist. LEXIS 181749, at *18 (D. Mass. Oct. 14, 2016) (citing Young, 404 F.3d at 9). "[A]n allegation of a local government's failure to train police officers who then violate a plaintiff's constitutional rights can be actionable where 'the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact' and where 'the identified deficiency in a city's training program [is] closely related to the ultimate injury.'" Young, 404 F.3d at 26 (quoting Harris, 489 U.S. at 388, 391) (second alteration in original).

It is undisputed that SPD has a use of force policy.  (Docket #68 at 14).  The record also establishes that Officer LaPorte received training at the Boylston Regional Police Academy through the Massachusetts Criminal Justice Training Council.  (Docket #61-2 at 8-9).  While in the academy, LaPorte received training on, among other things, firearms and the use of force. (Docket #61-2 at 9-11).  In addition, he received annual in-service training at the Boylston Regional Police Academy.  (Docket #61-2 at 12).  Despite this record, Plaintiff claims that the Town failed to offer training on the "de-escalation of force."  (Docket #68 at 14).

This claim is meritless.  Plaintiff fails to define "de-escalation of force," or to distinguish it from training LaPorte received on the use of force.  Indeed, the plain meaning of words used suggests that both "de-escalation" and "use" of force capture the notion that as circumstances change, so too does the authority to employ different levels of force.  (See Docket #67-1 ¶ 56 (internal citations omitted); Docket #67-1 ¶ 58; see also Docket #67-6).  As the First Circuit made clear in Young, "a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing."  Young, 404 F.3d at 27 (citing Harris, 489 U.S. at 391).  The distinction inherent in Plaintiff's claim fails to meet that standard.

Second, assuming arguendo that the difference between de-escalation and use is not mere semantics, Plaintiff has failed to establish that that failure to instruct on de-escalation of force caused the alleged excessive force.  Here, the incident was over in an instant based on LaPorte's deposition testimony that "I basically braced and fired the weapon.  It was all like a muscle memory type of reaction.  It was very quick."  (Docket #61-2 at 134-35).  Plaintiff fails to develop how principles of "de-escalation of force" would have operated in such circumstances.  Chief Darrin noted the volatility of police work, saying, "[I]t's everchanging and can be a rapidly changing

continuum.  A situation can escalate and quickly de-escalate so it's really a case-by-case scenario."
(Docket #61-2 at 16).  Chief Darrin further added that "as I've said before, it's a rapidly changing
incident, depending on circumstances, at times.  I mean, it can go from zero to a hundred in terms
of someone's behavior or their actions, and then it can also de-escalate if you step into something."
(Docket #61-2 at 44).[6]  Therefore, I recommend that the Court grant the motion for summary
judgment insofar as it relies on the Town's alleged failure to adequately train on "de-escalation of
force."  See Connick v. Thompson, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a
deprivation of rights is at its most tenuous where a claim turns on a failure to train."); see also
Oklahoma City v. Tuttle, 471 U.S. 808, 822 (1985) (stating that a policy of inadequate training is
"is far more nebulous, and a good deal further removed from the constitutional violation, than was
the policy in Monell") (plurality opinion).[7]

### Failure to Investigate, Supervise, and Discipline

Plaintiff also contends that that the Town had a custom, policy, or practice of failing to
adequately investigate, supervise, or discipline its officers.  There is no clear standard by which a
court can assess whether evidence adduced in support of a Monell claim rises to the level sufficient
to defeat a motion for summary judgment.  Cox, 2016 U.S. Dist. LEXIS 99890, at *29.  The Court,
however, "has set a very high bar for assessing municipal liability under Monell," Young,
404 F.3d at 26, and courts are reluctant to "lightly infer a municipal policy or practice from a few

---

[6]  The court recognizes that Plaintiff disputes LaPorte's account of the incident.  However, even
Plaintiff's version—that he raised his hands and voluntarily surrendered—would hardly implicate
the Town in a failure to train on the "de-escalation of force."  Plaintiff's account involves a more
fundamental failure to follow the continuum of force training that it is undisputed LaPorte
received.

[7]  The undersigned acknowledges the tension between this finding and the court's recommendation
that Count VI survive as to the Town's negligent training.  However, the allegation of a failure to
train under Monell is limited to "de-escalation of force," and Count VI is not so circumscribed.

scattered claims, lest every claim of excessive force [might] engender a <u>Monell</u> claim," <u>Cox</u>, 2016 U.S. Dist. LEXIS 99890, at *29.

In support of his claim for municipal liability based on a failure to investigate, supervise, and discipline, Plaintiff notes the following: (1) Chief Darrin tracks the use of force only if a weapon was involved, such as a gun, Taser, baton, or pepper spray (Docket #68 at 9; Docket #61-11 at 34); (2) the Spencer Police failed to conduct a meaningful investigation into the incident because Darrin deferred to MSP's investigation assessing whether criminal charges would be appropriate, instead of conducting its own investigation to determine whether SPD policies had been violated (Docket #68 at 10); (3) the Town has been sued once before for an excessive force claim that occurred eight years before Plaintiff's shooting, (Docket #68 at 11); and, (4) "[g]iven the allegations here, a jury could conclude that the Chief and the Town were on notice of officer LaPorte's possible propensity for violence."   (Docket #68 at 12).   Neither individually nor collectively do these establish a pervasive policy, practice, or custom by the Town, and therefore I recommend that this Court grant the motion for summary judgment as to Count VIII.  I address the last two matters first.

Plaintiff highlights a single excessive force claim against SPD, which occurred eight years before the instant episode and involved different officers.  (Docket #68 at 11).  Rarely, a <u>Monell</u> claim can be made based on a single constitutional violation.  <u>See</u> <u>Bryan Cty. v. Brown</u>, 520 U.S. 397, 409 (1997) ("In [<u>Canton v. Harris</u>, 489 U.S. 378 (1989)], we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.").  In those instances, it must be shown that the constitutional violation was "a highly predictable consequence of a failure to equip

law enforcement officers with specific tools to handle recurring situations." <u>Young</u>, 404 F.3d at 28 (quoting <u>Brown</u>, 520 U.S. at 409)).  Regardless of whether a <u>Monell</u> claim is predicated on a single or a pattern of violations, the "salient consideration" is whether there was notice. <u>Cox</u>, 2016 U.S. Dist. LEXIS 99890, at *29-30.  As Judge Saylor summarized, "the question is to a considerable extent one of degree: while a single accusation of excessive force is not enough, at some point, as the accusations and claims begin to pile up, a critical mass may be reached requiring an affirmative response from supervisors." <u>Id.</u> at 29.  Here, the single excessive force claim, eight years before LaPorte shot Plaintiff is insufficient to support municipal responsibility.

Plaintiff also contends that "[g]iven the allegations here, a jury could conclude that the Chief and the Town were on notice of officer LaPorte's possible propensity for violence." (Docket #68 at 12).  Plaintiff fails to identify any evidence in the record suggesting a propensity for violence.  The uncontroverted evidence in the record suggests the opposite.  Both Officers LaPorte and Office Magierowski have no disciplinary record.   (Docket #61-11 at 24-25). Moreover, neither LaPorte nor Magierowski have ever had a complaint lodged against them.  <u>Id.</u>

Plaintiff next claims that Chief Darrin demonstrated deliberate indifference by failing to track the use of force in incidents not involving the use of a weapon.   (Docket #68 at 9-10). Plaintiff, however, fails to develop this argument beyond a conclusory allegation, and its relevance is unclear where, as here, an officer used his weapon and hence is within the categories of incidents actually tracked.   Moreover, with regard to tracking the use of force generally, Chief Darrin deposed that he reads every report regardless of the level of force, stating:

> It's a small department so I read every report, every log entry that's generated and every report.  So basically any time that there's a use of force, *whether it's just a simple arrest where we just lay hands on someone*, or if there's use of a TASER or a baton or Mace, I review every report and determine whether it fits within or falls within the category of appropriate use within our [Spencer Police Department] policy.

(Docket #61-11 at 19) (emphasis added).  Plaintiff's argument is unpersuasive because, although the Chief does not separately track the use of force where no weapon was involved, he nonetheless reads every report and, in any case, Plaintiff has failed to suggest any causal connection between that failure and the distinct situation here, involving the use of a weapon.

Finally, Plaintiff relies on SPD's failure to independently investigate the shooting.  Chief Darrin deposed that he asked the MSP to conduct the investigation to avoid any "conflicts of interest."  (Docket #67-1 ¶ 112).  Chief Darrin understood that MSP's investigation was to assess only whether criminal charges should be brought, and not whether LaPorte's conduct complied with SPD's use of force policy.   (Docket #67-1 ¶¶ 110-11).   Relying on this, Plaintiff contends that the SPD "did not conduct any kind [of] investigation into Humphrey's shooting," (Docket #68 at 10), and that "the Town and Chief Darrin had a non-delegable duty to interview and investigate the shooting in an objective manner to determine if there was compliance with the policies and procedure of the SPD," (Docket #68 at 10).  The record simply fails to support Plaintiff's claim.

It cannot be disputed that the shooting was investigated.  MSP interviewed the critical witnesses including Plaintiff Humphrey, Katy Lajeunesse, Kim Thomas, Officer LaPorte, Officer Magierowski, Officer Lazarick, Sergeant Edwards, Trooper Mormino and Trooper Rogers, (Docket #61-10 at 6), and from these interviews and other information prepared a report. (See Docket #61-10 at 6).  Plaintiff does not identify any failures in the scope or thoroughness of the MSP investigation that would suggest it was a pretext for a genuine examination of the shooting and its circumstances.  It is also clear that the investigation was conducted in order to enable the Worcester County District Attorney to determine whether LaPorte should be charged with a crime, and that MSP investigators understood this purpose of the report.  (Docket #67-1 ¶¶ 110-11, 113).

Finally, there is no question that Chief Darrin reviewed MSP's report of the shooting. (Docket #67-1 ¶¶ 114, 121, 126).

While Chief Darrin did not commission an additional investigation and report, Plaintiff fails to identify any legal authority or policy reason suggesting that it would be inappropriate for a police department—particularly a small one, like Spencer—to use the MSP as a proxy for an investigation.  In fact, as Chief Darrin reasoned, using an outside agency for a sensitive, internal investigation minimizes any conflicts of interest or the appearance of impropriety, matters of which a small department with no internal affairs unit is particularly susceptible.   Indeed, an internal investigation would be vulnerable to a claim that it was biased.

In light of this, Plaintiff's core contention regarding the absence of an investigation boils down to the failure to make an express finding from the MSP report whether or not LaPorte's conduct violated SPD's use of force policy.  While that failure is suggestive of a custom or policy, the record shows that it is not enough to support municipal liability.  The record shows that LaPorte's conduct was evaluated with the prospect of potentially severe consequences.  The MSP independent investigation, or the Worcester County District Attorney's assessment of that investigation, had the potential to impact LaPorte's job, career, and even liberty.  Under such circumstances, Chief Darrin's failure to make a separate determination of compliance with SPD's use of force policy does not support the notion of a custom or policy tolerating excessive force. Second, it was Chief Darrin who asked MSP to conduct an investigation to determine whether criminal charges should be brought against Officer LaPorte.  (Docket #67-1 ¶ 110).  In other words, it was from within SPD itself that an investigation was undertaken that could have resulted in prosecuting LaPorte for a serious shooting.  Finally, the record suggests at least an implicit determination by Chief Darrin:  when asked how he would determine compliance with Spencer

policy, having outsourced the investigation, Chief Darrin deposed that he "was confident [he] was going to get the information that [he] needed from the state police investigation." (Docket #61-11 at 46). To return to, and paraphrase, Judge Saylor's observation: there comes a point when the accusations and claims begin to pile up, and a critical mass is reached requiring an affirmative response from supervisors. As a matter of law, I find that the evidence here falls short of that critical mass. Individually and collectively, the evidence to which Plaintiff points fails to establish a policy, custom or practice that would warrant imposition of municipal liability. I therefore recommend that the Court grant Defendants' motion as to Count VIII.

IV.    CONCLUSION

For the foregoing reasons, I recommend that the Court GRANT Defendant's motion (Docket #60) as to Counts V, VII, and VIII, and DENY the motion as to Count VI.[8]

/S/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[8]   The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portions of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72(b)(2). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).